## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

WILLIAM DAY,                         )
                                        )

    Plaintiff,                      )
                                         )

    v.                              )
                                         )  Case No. 5:25-cv-00211-NAD

SOCIAL SECURITY                      )
ADMINISTRATION,                      )
COMMISSIONER                         )
                                         )

    Defendant.                      )

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff William Day appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability insurance benefits (DIB).  Doc. 1.  Plaintiff Day applied for benefits with an alleged onset date of July 21, 2021.  Doc. 8-2 at 88.  The Commissioner denied Day's claim for benefits.  Doc. 8-2 at 23.  In this appeal, the parties consented to magistrate judge jurisdiction.  Doc. 11; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

### ISSUES FOR REVIEW

In this appeal, Day argues that the Administrative Law Judge (ALJ) did not

1

apply correct legal standards, and that the ALJ's determination regarding Day's residual functional capacity (RFC) is not supported by substantial evidence.  Doc. 14 at 6–14.

### STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:    (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the

administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     if not, whether the claimant has a severe impairment or combination of impairments;

(3)     if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)     if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5)     if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to

3

show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the

4

Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**     With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A.     Procedural background

On May 20, 2022, Day applied for disability insurance benefits (DIB),

alleging disability due to the amputation of his left leg above the knee from an accident in 2018. Doc. 8-2 at 88. Day alleged a disability onset date of July 21, 2021. Doc. 8-2 at 88.

Day's application was denied at the initial level (and on reconsideration). Doc. 8-2 at 93, 101. Following the initial denial of his claim, Day requested a hearing before an ALJ. Doc. 8-2 at 129. After Day agreed to appear by telephone, the ALJ held a telephonic hearing on June 4, 2024. Doc. 8-2 at 14. On July 25, 2024, the ALJ issued an unfavorable decision. Doc. 8-2 at 23.

The Appeals Council denied Day's request for review. Doc. 8-2 at 4. Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner on December 16, 2024. Doc. 8-2 at 4; *see* 42 U.S.C. § 405(g).

### B.    Factual background and ALJ hearing

Day was born on September 9, 1984. Doc. 8-2 at 87.

On February 8, 2018, Day presented to Gill Family Medicine for sinus congestion and headaches. Doc. 8-3 at 149.

On September 13, 2018, Day presented to Gill Family Medicine for a six-month follow-up appointment. Doc. 8-3 at 146. Day reported that he had a severe motorcycle accident six weeks prior to the appointment, resulting in the loss of his left leg above the knee. Doc. 8-3 at 146. Day reported that, after he was sent home

6

following the accident, his stump became infected, and Day had to return to UAB Hospital for further treatment. Doc. 8-3 at 146.

On October 2, 2018, Day presented to Gill Family Medicine for a referral to a neurologist and orthopedic physician. Doc. 8-3 at 143. Day reported that the doctors at UAB Hospital released him and "told him to get a local neurologist and orthopedic doctor for his above-the-knee amputation of his left leg." Doc. 8-3 at 143. Day reported persistent phantom pain. Doc. 8-3 at 143.

On October 19, 2018, Day presented to Gill Family Medicine for cough and emphysema. Doc. 8-3 at 140.

On March 13, 2019, Day presented to Gill Family Medicine for a checkup. Doc. 8-3 at 137. Day reported phantom pain in his leg and complained of constipation. Doc. 8-3 at 137.

On May 6, 2019, Day presented to Gill Family Medicine to discuss issues and documentation for insurance for a new socket for his prosthesis. Doc. 8-3 at 134. Day requested a referral for a different prosthesis because the one he obtained after his car accident was too big, causing irritation. Doc. 8-3 at 134.

On July 22, 2019, Day presented to Gill Family Medicine for a checkup. Doc. 8-3 at 130. Day reported that his eyes and lips were swollen from allergies. Doc. 8-3 at 130. Day also reported that he needed a new prosthetic sock and a new shower chair. Doc. 8-3 at 130. Day denied swelling of the tongue or having shortness of

breath.  Doc. 8-3 at 130.

On August 19, 2019, Day presented to Gill Family Medicine for a referral for a physical impairment test.  Doc. 8-3 at 127.  Day also reported that his nose had been "stopping up a lot lately."  Doc. 8-3 at 127.

On November 19, 2019, Day presented to Gill Family Medicine for a checkup. Doc. 8-3 at 124.  Day sought a new prosthetic sock.  Doc. 8-3 at 124.  Day "had to have a revision of his prosthesis due to his stump continuing to shrink."  Doc. 8-3 at 124.  Day reported that his prosthesis tended to ride up on the back of his leg, causing sores.  Doc. 8-3 at 124.

On March 18, 2020, Day presented to Gill Family Medicine "to see if he [could] get another foot piece for his prosthesis."  Doc. 8-3 at 121.  Day reported that he had a hard time getting shoes on his prosthesis and that a new foot piece would improve his ability to walk.  Doc. 8-3 at 121.  Day reported phantom pains in his left leg and walked with a limp due to poor mobility with his prosthetic leg.  Doc. 8-3 at 122.

On September 10, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for fit and delivery of prosthetic supplies.  Doc. 8-3 at 155. Day presented with distal, lateral limb irritation.  Doc. 8-3 at 155.  Day was fitted with a replacement liner.  Doc. 8-3 at 155.  Day reported success with current prosthetic fit and indicated a daily use of 10–12 hours.  Doc. 8-3 at 155.  Day

"seem[ed] happy with the fit and function of the device." Doc. 8-3 at 155.

On September 18, 2020, Day presented to Gill Family Medicine for a follow-up visit for his left leg amputation, phantom limb syndrome, and emphysema. Doc. 8-3 at 118. Day reported that he needed a new liner for his prosthesis and that he was tolerating Breo and Singulair well. Doc. 8-3 at 118. Day denied any cough or wheezing. Doc. 8-3 at 118.

On November 6, 2020, Day consulted with Alabama Artificial Limb and Orthopedic Service, Inc. through a telehealth appointment. Doc. 8-3 at 155. Day reported a "liner breakdown distally and fitting issues [with] current socket." Doc. 8-3 at 155. Day reported that suspension was stable but that he could sense a loss of distal suspension periodically. Doc. 8-3 at 155.

On November 13, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for trial fitting of a prosthesis. Doc. 8-3 at 155. Day was fitted with a temporary socket. Doc. 8-3 at 155.

On November 13, 2020, Day presented to Gill Family Medicine for a follow-up visit for phantom limb syndrome and emphysema. Doc. 8-3 at 115. Day reported that he was tolerating gabapentin well and denied any worsening numbness. Doc. 8-3 at 115. Day stated that he needed a new socket and liner for his prosthesis and that his stump was irritated in certain areas, causing soreness. Doc. 8-3 at 115. Day reported that he was tolerating Breo well and denied any cough or wheezing. Doc.

8-3 at 115.

On November 20, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a trial fitting of a prosthesis. Doc. 8-3 at 155. Day was fitted with a second temporary socket. Doc. 8-3 at 155.

On December 4, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a trial fitting of a prosthesis. Doc. 8-3 at 156. A successful fit was achieved, and Day did not express any concerns or complaints. Doc. 8-3 at 156.

On December 11, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for fit and delivery of a prosthesis. Doc. 8-3 at 156. Day was fit with a replacement socket and told to break-in the device slowly to allow his skin to adjust to the pressures. Doc. 8-3 at 156. Day "seemed happy with the fit and function of the device." Doc. 8-3 at 156.

On December 18, 2020, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a follow-up visit. Doc. 8-3 at 156. Day requested an alignment adjustment, and the foot and knee were externally rotated to improve anatomic alignment. Doc. 8-3 at 156. Day reported that he was wearing the prosthesis daily. Doc. 8-3 at 156.

On January 8, 2021, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc., requesting that the posterior trimline of his prosthesis be

10

lowered due to excess pressure. Doc. 8-3 at 156. Day reported that extended wear was resulting in skin irritation. Doc. 8-3 at 156.

On June 16, 2021, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a follow-up visit. Doc. 8-3 at 160. Day presented with a torn liner and associated irritation. Doc. 8-3 at 160. Day reported that he was working 10-hour maintenance shifts and required a fully functioning and well-fitting prosthesis to maintain his work. Doc. 8-3 at 160. Day was described as highly active, causing his liners to wear and show signs of cracking and tearing. Doc. 8-3 at 160.

On June 24, 2021, Day presented to Gill Family Medicine for a checkup, medication refills, and to request allergy testing. Doc. 8-3 at 112. Day reported a history of phantom pain, COPD, and allergic rhinitis. Doc. 8-3 at 112. Day reported intermittent episodes of urticaria, soft tissue edema to the periorbital area and around his lips, and mild chest tightness. Doc. 8-3 at 112.

On June 6, 2022, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a socket replacement. Doc. 8-3 at 153. Day reported that he had been ambulating independently since he received his first prosthesis. Doc. 8-3 at 153. Dylan Baas, CPO, reported that Day did not have any cognitive impairment that would limit his working ability but that Day "does fatigue faster than individuals with two sound limbs." Doc. 8-3 at 153. Baas also found that Day "requires frequent adjustments and breaks throughout the day to maintain comfort and suspension of

11

his prosthesis." Doc. 8-3 at 153. Baas opined that "it may be difficult for [Day] to find a job suited to his physical ability and with consideration to his prosthesis." Doc. 8-3 at 153. Baas found that Day's hand dexterity was uncompromised and his upper body strength was good. Doc. 8-3 at 153. Day was rated a Functional Level K3 based on the amputee mobility predictor administered at the appointment. Doc. 8-3 at 163. Day had the ability or potential for ambulation with variable cadence and the ability to traverse most environmental barriers. Doc. 8-3 at 163.

On August 24, 2022, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. to confirm his liner and brim size prior to scheduling a direct socket fitting. Doc. 8-3 at 171.

On September 6, 2022, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a direct socket fitting. Doc. 8-3 at 172. Day arrived in the office without an assistive device. Doc. 8-3 at 177. Day was described as motivated to walk and use a prosthesis. Doc. 8-3 at 172. At the appointment, Day ambulated in the parallel bars for approximately 45 minutes while alignment and height were set. Doc. 8-3 at 172.

On September 9, 2022, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for adjustments to his transfemoral replacement socket. Doc. 8-3 at 174.

On September 16, 2022, Day presented to Alabama Artificial Limb and

12

Orthopedic Service, Inc. for adjustments to his transfemoral replacement socket. Doc. 8-3 at 175.

On March 29, 2023, Day presented to Nichols Family Care for allergies and pain in his right leg and left stump. Doc. 8-3 at 219.

On April 24, 2023, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a prosthesis. Doc. 8-3 at 182. Day reported that he visually noticed a decrease in limb volume and was unable to maintain suspension. Doc. 8-3 at 182. Day reported that he was able to independently perform all self-care procedures and was responsible for home maintenance tasks such as cleaning and lawn care. Doc. 8-3 at 183.

On April 26, 2023, Day presented to Nichols Family Care with no new complaints. Doc. 8-3 at 216.

On May 30, 2023, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for a dynamic diagnostic fitting appointment. Doc. 8-3 at 185. Day reported no changes in his medical condition and reported that his pain was a 0 out of 10. Doc. 8-3 at 185. Adjustments were made to Day's prosthesis, and Day was able to bear full weight into the test socket with minor discomfort. Doc. 8-3 at 186.

On June 14, 2023, Day presented to Alabama Artificial Limb and Orthopedic Service, Inc. for fitting and delivery of his replacement socket. Doc. 8-3 at 186.

On June 26, 2023, Day presented to Alabama Artificial Limb and Orthopedic

13

Service, Inc. for adjustments to his prosthesis.  Doc. 8-3 at 188–89.

On September 6, 2023, Day underwent a psychological evaluation with James B. Lindsey, Psy.D.  Doc. 8-3 at 191.  Day reported anxiety and depression and stated that he feels hopeless, helpless, worthless, and sometimes sad.  Doc. 8-3 at 191.  Day reported sleeplessness, fatigue, a fluctuating appetite, and a stable weight.  Doc. 8-3 at 191.  Day reported that his depression and anxiety began after his motorcycle accident that caused his leg to be amputated.  Doc. 8-3 at 191.  Day's gait was slow, and he walked without assistance.  Doc. 8-3 at 192.  Day had normal posture and had no difficulty sitting and rising from a chair.  Doc. 8-3 at 192.  Day appeared capable of using all extremities with the exception of his lower left leg, and there was no obvious fine motor impairment.  Doc. 8-3 at 192.  Day reported that he could drive himself, bathe himself, prepare food, and take care of his activities of daily living.  Doc. 8-3 at 193.  Day also reported that he does some housework and yardwork and spends a typical day caring for his son.  Doc. 8-3 at 193.  Day stated that he does not feel capable of independent living because he could not care for his son alone.  Doc. 8-3 at 193.  Lindsey found that Day's mental health complaints appeared to be most consistent with major depressive disorder.  Doc. 8-3 at 194.

On November 7, 2023, Day underwent a consultative examination with Stacy Davis, FNP.  Doc. 8-3 at 194–203.  Day reported increased anxiety and depression, nerve pain, and muscle pain around July 2022.  Doc. 8-3 at 195.  Day had no

14

difficulty sitting but moderate difficulty with walking and standing.  Doc. 8-3 at 196.

Day reported that he could cook and meal prep independently while sitting, bathe

and dress independently with assistance, shop and bank independently, do

housekeeping and laundry independently, and drive independently.  Doc. 8-3 at 196.

Davis diagnosed Day with depression, anxiety, left knee amputation, right knee

strain, and right ankle strain.  Doc. 8-3 at 202.  Davis found that Day was unable to

bend, knee squat, or kneel and that Day had frequent limitation with walking,

standing, climbing stairs, walking on uneven terrain, pushing and pulling, and lifting.

Doc. 8-3 at 202.

On November 13, 2023, Day presented to Nichols Family Care for leg pain.

Doc. 8-3 at 213.  Day reported right-sided leg pain from knee to ankle.  Doc. 8-3 at

213.  Day was prescribed Mobic and tramadol as needed.  Doc. 8-3 at 213.

On December 5, 2023, Day presented to Alabama Artificial Limb and

Orthopedic Service, Inc. for fitting and delivery of his prosthesis.  Doc. 8-3 at 207.

On February 20, 2024, Day presented to Nichols Family Care for right leg

pain.  Doc. 8-3 at 210.  Day was referred to an orthopedic physician with pain in his

right leg from compensating gait.  Doc. 8-3 at 212.

On May 8, 2024, Day presented to DOC Orthopaedics & Sports Medicine

with right knee pain.  Doc. 8-2 at 50.  Day reported that walking, standing, and

climbing stairs increased his pain.  Doc. 8-2 at 50.  An examination revealed some

15

mild patellofemoral crepitus.  Doc. 8-2 at 51.

On June 4, 2024, the ALJ held a telephonic hearing on Day's application for benefits.  Doc. 8-2 at 68.

Day testified that he finished high school but did not continue any schooling after high school.  Doc. 8-2 at 71.  Day testified he worked in maintenance at Wayne Farms, performing mechanical, electrical, and HVAC maintenance tasks that often required him to lift over 50 pounds.  Doc. 8-2 at 71–72.  Day testified that he worked a similar job for National Packaging Company, but that he was laid off on July 21, 2021.  Doc. 8-2 at 72.  Day testified that he "was actually kind of relieved when [National Packaging Company] said they [were] going to lay [him] off, because [he] was having a really hard time trying to work."  Doc. 8-2 at 75.

Day also testified that he was in a motor vehicle accident in July 2018.  Doc. 8-2 at 73–74.  Day testified that, after the accident, he went back to work at Wayne Farms for "about a year."  Doc. 8-2 at 74.  Day testified that he had "a little bit of difficulty" performing the duties of his job at Wayne Farms following his accident.  Doc. 8-2 at 74.

Day testified further that he has problems walking around and while sitting.  Doc. 8-3 at 76.  Day testified that, when he sits, he has to be "in a reclined position" because sitting normally "causes nerve pain."  Doc. 8-2 at 76.  Day testified that he sits in a reclined position for about 5 hours between 8:00 AM and 5:00 PM daily and

16

that he can stand for about 30 minutes at a time. Doc. 8-2 at 77.

Day testified that, while his "stump was shrinking to some degree," it has "reached [the] point" where the shrinking has stopped. Doc. 8-2 at 76. Day testified that, while his stump has stopped shrinking, he still must have his prosthesis adjusted "every six months or so" from normal wear and tear and to correct fitting issues. Doc. 8-2 at 76–77.

Day also testified that he can lift and carry 25 pounds comfortably and can walk 50 to 60 yards. Doc. 8-2 at 77–78. Day testified that he experiences phantom pain "24/7," and the pain increases with standing and walking. Doc. 78. Day testified that he does basic housework, using the dishwasher and washing machine. Doc. 8-2 at 78. Day testified that he uses a riding lawnmower to mow the lawn, and he takes out the garbage. Doc. 8-2 at 78.

Day testified further that he cares for his two-year-old son with the help of his parents who live nearby. Doc. 8-2 at 79. Day testified that his parents help with household chores and errands. Doc. 8-2 at 79.

Day testified that he experiences nerve pain, phantom pains, and stabbing pains. Doc. 8-2 at 79. Day testified that, because he does not have his left leg, he overcompensates with his right leg, which has caused problems with his lower back and his right knee, ankle, and hip. Doc. 8-2 at 79.

Vocational Expert (VE) Robert Grant testified that a hypothetical individual

17

with Day's age, education, work experience, and the limitations posed by the ALJ could perform jobs that exist in significant numbers in the national economy. Doc. 8-2 at 81–84.

## C. ALJ decision

On July 25, 2024, the ALJ entered an unfavorable decision. Doc. 8-2 at 14–23. In the decision, the ALJ concluded that Day "has not been under a disability, as defined in the Social Security Act, from July 21, 2021, through the date of this decision." Doc. 8-2 at 22.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178). Doc. 8-2 at 15–16. The ALJ found that Day has not engaged in substantial gainful activity since July 21, 2021. Doc. 8-2 at 17. The ALJ found that Day has severe impairments of left above the knee amputation and right knee and ankle strain due to compensated gait. Doc. 8-2 at 17.

As to Day's medically determinable mental impairments, the ALJ found that Day's major depressive disorder and generalized anxiety disorder "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." Doc. 8-2 at 17. The ALJ found that Day has no limitation in understanding, remembering, or applying information. Doc. 8-2 at 17. As to interacting with others, the ALJ found that Day has mild limitation and

18

does not appear to have relational issues that would interfere with his ability to maintain employment. Doc. 8-2 at 17. The ALJ also found that Day has mild limitation with concentrating, persisting, or maintaining pace. Doc. 8-2 at 17. The ALJ found that Day was attentive and demonstrated no difficulty following the flow of the evaluation. Doc. 8-2 at 17. As to adapting or managing oneself, the ALJ found that Day has mild limitation. Doc. 8-2 at 17. The ALJ found that Day drives, prepares food, bathes himself, manages finances, and takes care of his son, but that Day does have assistance at home due to his physical limitations. Doc. 8-2 at 17–18.

The ALJ found that Day did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 8-2 at 18.

The ALJ then determined Day's residual functional capacity (RFC), finding that Day could "perform light work" as defined in the regulations, except that he could stand/walk four hours total out of eight hours; could not kneel, crawl, or climb ladders/ropes/scaffolds; could occasionally balance, crouch, and climb ramps/stairs; could occasionally stoop; and could not work at unprotected heights or around unguarded moving machinery. Doc. 8-2 at 18.

In assessing Day's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process":

19

(1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 8-2 at 19.  The ALJ also stated that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-2 at 19.

In finding Day's RFC, the ALJ considered information from Day's medical records and hearing testimony regarding the limitations from his impairments, including testimony that, "after his car accident, [Day] went back to work for a year." Doc. 8-2 at 19.  The ALJ considered Day's testimony that he was laid off but that "he would not have been able to continue to work there anyway."  Doc. 8-2 at 19. The ALJ also considered Day's testimony that, when sitting, Day has to be in a reclined position due to nerve pain and that he "spends five hours a day reclining." Doc. 8-2 at 19.  The ALJ considered Day's testimony that he can lift 25 pounds, walk 50–60 yards without experiencing pain, and that he "has phantom pain at all times with a level of 3/10."  Doc. 8-2 at 19.  The ALJ considered Day's testimony that he does basic housework such as unloading the dishwasher, laundry, general

20

cleaning, and riding the lawnmower. Doc. 8-2 at 19. The ALJ also considered Day's testimony that he takes care of his son and that he "overcompensates with the other leg which has caused pain." Doc. 8-2 at 19.

After considering the record and subjective allegations, the ALJ found that Day's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-2 at 19.

The ALJ summarized the evidence underlying the ALJ's decision, finding that the medical evidence shows that Day "did not have any cognitive impairment that would prevent him from working but he does fatigue faster due to needing frequent adjustments and breaks throughout the day to maintain comfort and suspension of his prosthesis." Doc. 8-2 at 19. The ALJ found that this statement "is not from a medical doctor, rather from a 'CPO.'" Doc. 8-2 at 19. The ALJ found that the CPO noted that "it may be difficult for [Day] to find a job suited to his physical abilities." Doc. 8-2 at 19. But the ALJ found that this statement "does not opine specific physical limitations" and that "[t]he ability to find a job is not relevant to the disability analysis." Doc. 8-2 at 19. The ALJ also found that "of note is the fact that the statement refers to the claimant as having a right leg amputation; however, it is the left leg that was amputated" and that the CPO's "opinion is not persuasive." Doc. 8-2 at 20.

21

The ALJ found that, in June 2021, Day "was working 10 hour shifts in a plant and needed new liners in his prosthetic due to being 'highly active.'" Doc. 8-2 at 20. The ALJ found that on June 8, 2022, Day "required adjustments due to the conical shape of his residual limb and the large baseplate on his direct socket causing distal end pain." Doc. 8-2 at 20. The ALJ found that, in September 2022, Day "represented for a direct socket fitting and he ambulated without an assistive device." Doc. 8-2 at 20. The ALJ also found that, in May 2023, Day "had visually noticed a decrease in limb volume; however, he testified that the shrinking issue had been resolved." Doc. 8-2 at 20. The ALJ found that, in December 2023, Day "underwent another fitting for his prosthesis which he testified happens approximately every 6 months." Doc. 8-2 at 20. The ALJ found that "[n]otably chronic complaints of phantom pain [are] not seen in the treatment records." Doc. 8-2 at 20.[1]

The ALJ also found that the consultative psychological examiner found major depression and generalized anxiety disorder but no more than mild limitations. Doc. 8-2 at 20. The ALJ found that the physical consultative examiner found a left knee

---

[1] In his brief, Day argues that this "finding is simply not supported by substantial evidence." Doc. 14 at 7. Any error in this regard would be harmless. *See, e.g.*, *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard in the Social Security context). Among other things (and as noted above in text), the ALJ considered Day's testimony that "[h]e has phantom pain at all times with a level of 3/10." Doc. 8-2 at 19.

22

amputation and right knee and ankle strain.  Doc. 8-2 at 20.  The ALJ also found that, despite Day's "complaints of pain and difficulty with walking for prolonged time and falling, he is independent in his cooking, personal care, laundry, driving, and running short errands."  Doc. 8-2 at 20.[2]

The ALJ found further that the state agency consultants' opinions "are persuasive insofar as they are consistent with the totality of the evidence."  Doc. 8-2 at 20.  The ALJ also found that the opinions of the state agency psychological consultants, who found that Day's mental impairments "cause no more than mild limitations and are therefore nonsevere," are persuasive given the lack of treatment and the opinion from the psychological consultative examiner, James Lindsey, Psy.D.  Doc. 8-2 at 21.

The ALJ found that Lindsey opined that Day's "current mental health symptoms appear to be posing mild impairment for the claimant in terms of his employability."  Doc. 8-2 at 21.  The ALJ also found that Lindsey had found that

---

[2] In his brief, Day also argues that the ALJ "further erred when he found the Plaintiff's daily activities inconsistent with his allegations of debilitating symptoms and limitations."  Doc. 14 at 11.  But substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158), and the court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178).  As noted above in text (and among other things), the ALJ found that Dr. Lindsey had found that Day "can perform his activities of daily living without assistance" but that Day "stated he does not feel like he is capable of independent living."  Doc. 8-2 at 21; *see* Doc. 8-3 at 193–94.

Day "can perform his activities of daily living without assistance" but that Day "stated he does not feel like he is capable of independent living." Doc. 8-2 at 21. The ALJ found that Lindsey's opinion "is persuasive as it is consistent with the totality of the evidence including the lack of treatment and the opinions of the State agency consultants." Doc. 8-2 at 21.

The ALJ also found that Stacy Davis, FNP, opined that "the claimant has a frequent limitation to inability to perform bending, knee squatting and kneeling; frequent limitation walking, standing, climbing stairs and walking on uneven terrain, unsteady, unbalanced gait; frequent limitation with pushing/pulling/lifting." Doc. 8-2 at 21. The ALJ found that Davis' "opinion is not completely persuasive" and that the ALJ's RFC determination "gives much more restrictions than [Davis] opined." Doc. 8-2 at 21.

The ALJ then found that Day is unable to perform any past relevant work. Doc. 8-2 at 21.

After considering Day's age, education, work experience, RFC, and the testimony of the VE, the ALJ found that Day could perform jobs that exist in significant numbers in the national economy. Doc. 8-2 at 22. Consequently, the ALJ found that Day had "not been under a disability, as defined in the Social Security Act, from July 21, 2021, through the date of this decision." Doc. 8-2 at 21.

24

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards. Day argues in his brief that the ALJ "relied upon isolated notions in the record to support his determination the Plaintiff could perform a range of light work" (Doc. 14 at 7), and that the ALJ's "selective treatment of the record is not in accordance with applicable law" (Doc. 14 at 9). But the ALJ properly assessed Day's subjective testimony regarding his impairments and associated symptoms, as the ALJ's decision was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Day's subjective testimony regarding his symptoms.

## I.    The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also*

25

*Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. § 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, in analyzing Day's RFC, the ALJ stated that the ALJ "must follow a two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 8-2 at 19. According to the ALJ, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-2 at 19.

The ALJ then applied the two-part test and found first that Day's medically

determinable impairments, including his left leg amputation, could reasonably be expected to cause the alleged symptoms. Doc. 8-2 at 19. The ALJ then found second that Day's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-2 at 19. Thus, the ALJ's decision was based on the proper legal standards.

## II. Substantial evidence supports the ALJ's decision to partially discredit Day's subjective testimony regarding his impairments and associated symptoms.

Furthermore, substantial evidence supports the ALJ's decision not to fully credit Day's subjective testimony regarding his impairments and associated pain and symptoms.

### A. The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms

have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."    20 C.F.R. § 416.929(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. § 416.929.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms.  *See* 20 C.F.R. § 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms."  *See* 20 C.F.R. § 416.929(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to

cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[3]  "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

B.    **The ALJ properly explained the decision not to fully credit Day's subjective testimony regarding his symptoms, and substantial evidence supports that decision.**

The ALJ properly explained the decision to partially discredit Day's subjective testimony regarding his pain and symptoms, and substantial evidence supports the ALJ's decision.

In his brief, Day argues that the "record does not contain substantial evidence to support the ALJ's negative credibility determination as it pertains to his

---

[3] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)).  But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record.  *Id.* at 1308 n.3.

conclusion that the Plaintiff can perform a range of light work on a sustained basis." Doc. 14 at 7.

But the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Day's testimony was not entirely consistent with the record evidence and the ALJ's RFC finding of light work with postural and environmental limitations.

The ALJ made an explicit finding that Day's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-2 at 19. The ALJ provided a detailed analysis of the record medical evidence regarding Day's amputation, taking into consideration Day's treatment records, records from his prosthesis appointments, and consultative examinations. Doc. 8-2 at 19–21. The ALJ then found that the "residual functional capacity set forth in this decision gives much more restrictions than th[e] [consultative] examiner [Stacy Davis, FNP] opined," and that the "opinions [by State agency psychological consultants] are more persuasive and also more restrictive than [Davis'] opinion." Doc. 8-2 at 21.

The ALJ considered the "totality of the evidence." Doc. 8-2 at 21. The ALJ considered that Day was "highly active" in June 2021, working 10-hour shifts in a plant after his accident. Doc. 8-2 at 21. The ALJ also considered Day's prosthesis appointments, where he required adjustments in June 2022 and had a direct socket

30

fitting, ambulating without an assistive device, in September 2022.  Doc. 8-2 at 21.
The ALJ considered that Day's straight leg raise test "was negative seated and he had full strength except 4/5 on the right lower extremity."  Doc. 8-2 at 21.  The ALJ also considered Day's ability to cook, care for himself and his son, drive, and do housework independently, despite "his complaints of pain and difficulty with walking for a prolonged time and falling."  Doc. 8-2 at 21.

The environmental and postural limitations placed on Day's RFC to perform light work show that the ALJ partially credited Day's subjective testimony into account when finding his RFC.  Day testified that he could stand for "about 30 minutes" at a time and can walk "about 50 to 60 yards."  Doc. 8-2 at 77–78.  In limiting Day's RFC, the ALJ found that Day could "stand/walk four total out of eight hours" with "no kneeling, crawling, or climbing ladders/ropes/scaffolds."  Doc. 8-2 at 18.

Further, "[t]he residual functional capacity is an assessment based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments."  *Lewis*, 125 F.3d 12 1440.  And, according to Social Security Ruling 96-8P, "RFC is not the least an individual can do despite his or her limitations or restrictions, but the *most*."   1996 WL 374184 at *2 (July 2, 1996) (emphasis in original).

In this regard, the ALJ's decision considered information based on both

objective and subjective evidence, accounting for evidence supporting Day's testimony, while also clearly identifying evidence calling into doubt Day's subjective testimony about the intensity, persistence, and limiting effects of his symptoms. *See* 20 C.F.R. § 416.929.

Thus, the ALJ's decision and RFC finding included the necessary "explicit and adequate reasons" for partially discrediting Day's subjective testimony about his symptoms. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Day's] medical condition as a whole," and the decision was not just a "broad rejection" of Day's subjective testimony. *Dyer*, 395 F.3d at 1210.

Substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158), and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158–59 (quoting *Martin*, 894 F.2d at 1529)). This court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178), and there is sufficient evidence in the record to support the ALJ's findings that Day's testimony regarding his symptoms was not consistent with the record as a whole and that Day was able to perform light work with limitations (based on Day's own testimony). Accordingly, substantial evidence supports the ALJ's decision. The ALJ clearly articulated a credibility finding that was supported by

32

substantial evidence, and the court cannot disturb that finding. *See Foote*, 67 F.3d at 1562.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this March 17, 2026.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE

33